PER CURIAM.
 

 James Eugene Hunter appeals an order denying his successive motion for postcon-viction relief filed pursuant to Florida Rule of Criminal Procedure 3.851. We have jurisdiction.
 
 See
 
 art. V, § 3(b)(1), Fla. Const. For the reasons explained below, we affirm the circuit court’s denial of Hunter’s postconviction motion.
 

 FACTUAL AND PROCEDURAL HISTORY
 

 Hunter was convicted of one count of first-degree murder, three counts of attempted first-degree murder, one count of attempted armed robbery, and three counts of armed robbery.
 
 Hunter v. State (Hunter I),
 
 660 So.2d 244, 247 (Fla.1995). The facts in this case are summarized in our opinion in Hunter’s direct appeal:
 

 The following facts were established at trial. On September 16, 1992, James Hunter (a.k.a. Michael Miller), Tammie Cowan, Cathy Woodward, Charles Anderson, [Bruce Pope (a.k.a. Andre Smith) ], and Eric Boyd [ (a.k.a. Lee Lewis) ] traveled by car from St. Augustine to DeLand. Tammie Cowan testified that there were two black BB guns and one silver handgun in the car. Boyd and Anderson had the BB guns and Hunter had the handgun. In De-Land they stopped briefly to see Andre Smith’s mother. Thereafter, at approximately 11:44 p.m., Cowan stopped the car and Anderson, Boyd, Smith, and Hunter exited. Hunter then confronted and robbed a man on the street, using the silver handgun. Hunter and his companions then departed for Daytona Beach. Shortly afterwards, a “be on the lookout” (BOLO) alert for the DeLand robbers was transmitted by the police throughout the Volusia County area. The BOLO described a gray four-door sedan occupied by at least five black
 
 *260
 
 individuals, two of whom were females, who were suspects.
 

 After the robbery, Hunter directed Cowan to drive to Daytona Beach and the vicinity of Bethune-Cookman College where four young men were standing outside the “Munch Shop.” Hunter instructed Cowan to stop the vehicle, and Hunter, Lewis, Anderson, and Smith exited and approached the four men. Hunter was armed with the silver handgun.
 

 Hunter approached the men and ordered them to “give it up.” Hunter and his companions then robbed the men at gunpoint. Thereafter, while the men were lying face down on the sidewalk, Hunter shot each of them in turn. Wayne Simpson was the last victim to be shot in this process, and he subsequently died. Hunter and his colleagues then fled with the victims’ clothing, jewelry, and other miscellaneous items of personal property. When Hunter returned to the car, he ordered Cowan to leave, and told her that he had fired the gun because a victim had tried to run. Shortly thereafter, at 12:40 a.m., Deputy Richard Graves observed a vehicle in Ormond Beach matching the DeLand BOLO. Graves stopped the automobile, and Cowan told Graves that she and the others had come from DeLand. While the car was stopped, the DeLand robbery victim was brought to the scene where he identified Hunter as his robber and also identified the car. Cowan consented to a search of the car which yielded two BB guns and personal property belonging to the victims of both the DeLand and Daytona Beach robberies. The gun used by Hunter was never found.
 

 Id.
 
 at 246-47. The jury recommended that Hunter receive the death penalty for Simpson’s murder, and the trial court followed the jury’s recommendation and sentenced Hunter to death.
 
 Id.
 
 We affirmed Hunter’s convictions and sentence of death on direct appeal.
 
 Id.
 
 at 246.
 

 Hunter then filed an initial postconviction motion in March 1997.
 
 Hunter v. State (Hunter
 
 II), 817 So.2d 786, 790 (Fla.2002). He subsequently filed two amended postconviction motions, raising thirteen claims with multiple subparts.
 
 Id.
 
 The trial court ordered an evidentiary hearing on four of Hunter’s claims and summarily denied the remainder of the claims.
 
 Id.
 
 at 790-91. After holding an evidentiary hearing on April 5, 2000, the trial court denied all relief.
 
 Id.
 
 at 791. This Court affirmed the trial court’s order denying postconviction relief and denied Hunter’s petition for writ of habeas corpus.
 
 Id.
 
 at 789. Hunter subsequently filed a petition for writ of habeas corpus in federal district court, the denial of which was affirmed by the United States Court of Appeals for the Eleventh Circuit.
 
 Hunter v. Sec’y, Dep’t of Corr. (Hunter III),
 
 395 F.3d 1196, 1199, 1206 (11th Cir.2005).
 

 On October 3, 2005, Hunter filed a successive motion for postconviction relief pursuant to Florida Rule of Criminal Procedure 3.851. After the circuit court issued an order striking the 3.851 motion, Hunter filed an amended 3.851 motion on January 11, 2006. Hunter’s amended motion contained the same claims as the original motion but added information to the motion. The trial court held a
 
 Huff
 

 [1]
 

 hearing on Hunter’s amended postconviction motion on November 14, 2006. On December 22, 2006, the circuit court denied Hunter’s postconviction motion without holding an evidentiary hearing on any of the claims. This appeal followed.
 

 
 *261
 
 ANALYSIS
 

 Hunter challenges the summary denial of each of the four claims raised in his successive postconviction motion: (1) another codefendant was the shooter; (2) defense counsel had an actual conflict of intei’est in representing Hunter and a State witness; (3) a State witness was incompetent to testify at trial; and (4) violations of
 
 Brady v. Maryland,
 
 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and
 
 Giglio v. United States,
 
 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), occurred through the State’s failure to disclose threats and promises to a State witness. We will discuss each of these issues in turn, but first we will explain the requirements for a rule 3.851 motion and the standard of review.
 

 Florida Rule of Criminal Procedure 3.851 governs the timeliness of postconviction motions in capital cases. Rule 3.851(d)(1) prohibits the filing of a postcon-viction motion more than one year after the judgment and sentence become final. An exception to the rule permits otherwise untimely motions if the movant alleges that “the facts on which the claim is predicated were unknown to the movant or the movant’s attorney and could not have been ascertained by the exercise of due diligence.” Fla. R.Crim. P. 3.851(d)(2)(A).
 

 Rule 3.851 also sets outs certain pleading requirements for initial and successive postconviction motions. Among other requirements, the motion must state the nature of the relief sought and must include “a detailed allegation of the factual basis for any claim for which an evidentiary hearing is sought.” Fla. R.Crim. P. 3.851(e)(1)(C), (e)(1)(D), (e)(2)(A). A successive motion based upon newly discovered evidence,
 
 Brady,
 
 or
 
 Giglio
 
 must also include
 

 (i) the names, addresses, and telephone numbers of all witnesses supporting the claim;
 

 (ii) a statement that the witness will be available, should an evidentiary hearing be scheduled, to testify under oath to the facts alleged in the motion or affidavit;
 

 (iii) if evidentiary support is in the form of documents, copies of all documents shall be attached, including any affidavits obtained; and
 

 (iv) as to any witness or document listed in the motion or attachment to the motion, a statement of the reason why the witness or document was not previously available.
 

 Fla. R.Crim. P. 3.851(e)(2)(C).
 

 Rule 3.851(f)(5)(B) permits the denial of a successive postconviction motion without an evidentiary hearing “[i]f the motion, files, and records in the case conclusively show that the movant is entitled to no relief.” Because a court’s decision whether to grant an evidentiary hearing on a rule 3.851 motion is ultimately based on written materials before the court, its ruling is tantamount to a pure question of law, subject to de novo review.
 
 See State v. Coney,
 
 845 So.2d 120, 137 (Fla.2003) (holding that “pure questions of law” that are discernable from the record “are subject to de novo review”). In reviewing a trial court’s summary denial of postconviction relief, this Court must accept the defendant’s allegations as true to the extent that they are not conclusively refuted by the record.
 
 Rutherford v. State,
 
 926 So.2d 1100, 1108 (Fla.2006) (citing
 
 Hodges v. State,
 
 885 So.2d 338, 355 (Fla.2004)). The summary denial of a newly discovered evidence claim will be upheld if the motion is legally insufficient or its allegations are conclusively refuted by the record.
 
 McLin v. State,
 
 827 So.2d
 
 *262
 
 948, 954 (Fla.2002) (citing
 
 Foster v. State,
 
 810 So.2d 910, 914 (Fla.2002)).
 

 IDENTITY OF THE SHOOTER
 

 Hunter asserts that the circuit court erred in denying an evidentiary hearing on his claim of newly discovered evidence of codefendant Eric Boyd’s recent confession to shooting Taurus Cooley, one of the surviving victims, in a dispute over drugs.
 
 [2]
 
 Hunter alleged in his postconviction motion that the testimony of Boyd, Bruce Pope,
 
 [3]
 
 and Charles Anderson
 
 [4]
 
 would verify that “the reason for the trip to Daytona Beach was for Mr. Boyd (who was armed with a pearl handled pistol) to obtain the drugs or money from Mr. Cooley.” Hunter alleged that the newly discovered evidence would establish that Hunter “was not involved in the shooting and that, in fact, he was not in the immediate area when the shooting took place.” The circuit court denied this claim, finding that it failed to satisfy the first prong of
 
 Jones v. State,
 
 709 So.2d 512 (Fla.1998), and that the allegations were facially insufficient to establish that Hunter would probably be acquitted of the murder of Wayne Simpson.
 

 To obtain a new trial based on newly discovered evidence, a defendant must meet two requirements.
 
 Jones,
 
 709 So.2d at 521. First, the evidence must not have been known by the trial court, the party, or counsel, and it must appear that the defendant or defense counsel could not have known of it by the use of due diligence.
 
 Id.
 
 (citing
 
 Torres-Arboleda v. Dugger,
 
 636 So.2d 1321, 1324-25 (Fla.1994)). Second, the evidence “must be of such nature that it would probably produce an acquittal on retrial.”
 
 Id.
 
 (citing
 
 Jones v. State,
 
 591 So.2d 911, 915 (Fla.1991)). Newly discovered evidence satisfies the second prong of the
 
 Jones
 
 test if it “weakens the case against [the defendant] so as to give rise to a reasonable doubt as to his culpability.”
 
 Id.
 
 at 526 (quoting
 
 Jones v. State,
 
 678 So.2d 309, 315 (Fla.1996)).
 

 In denying Hunter’s claim, the circuit court concluded that Hunter failed to satisfy the first prong of
 
 Jones
 
 because “the fact concerning the reason Defendant and his co-defendants came to Daytona Beach, and the sequence of events at the crime scene, are within Defendant’s knowledge.” While the court’s observation may be correct in the sense that those specific facts were within Hunter’s knowledge, the circuit court erred in finding that Hunter’s entire claim failed to meet the first prong of
 
 Jones.
 
 The bulk of Hunter’s claim was based on his assertion that codefendant Boyd recently confessed to shooting Cooley in a dispute over drugs and that his testimony and the testimony of codefen-dants Pope and Anderson would corroborate that the reason for the trip to Dayto-na Beach was for Boyd to obtain the drugs or money from Cooley. Moreover, Blunter alleged that Boyd previously refused to give a statement because he was promised by prosecutors that they would clear the
 
 *263
 
 matter up and that he should keep quiet. Hunter also alleged that Pope and Anderson remained silent because of promises from the State that they would receive leniency from their sentences.
 

 In similar circumstances, Florida courts have found post-trial confessions from co-defendants to qualify as newly discovered in the sense that the evidence was not known at the time of trial and could not have been known by the use of due diligence.
 
 See Brantley v. State,
 
 912 So.2d 342, 342-43 (Fla. 3d DCA 2005) (remanding for an evidentiary hearing based on the affidavit of a codefendant which stated the defendant was not present and was not involved in the shooting and based on the postconviction motion which alleged that defense counsel tried to obtain the code-fendant’s cooperation but was refused);
 
 Roundtree v. State,
 
 884 So.2d 322, 323 (Fla. 2d DCA 2004) (holding that the defendant’s allegations that his codefendant admitted that the defendant had no role in the robbery and that the codefendant had not testified on the defendant’s behalf because he had been coerced by the State were sufficient to state a prima facie claim of newly discovered evidence);
 
 Kendrick v. State,
 
 708 So.2d 1011, 1012 (Fla. 4th DCA 1998) (stating that a codefendant’s sworn post-trial testimony that he lied to police and that he was told by police to say he got the cocaine from the defendant in order to keep his own prison time to a minimum qualified as newly discovered evidence because it was unknown, the code-fendant was unwilling to give the testimony previously, and the testimony could not have been secured through due diligence);
 
 State v. Gomez,
 
 363 So.2d 624, 626-28 (Fla. 3d DCA 1978) (treating as newly discovered evidence the post-trial affidavit of a codefendant confessing to having committed the robbery without the defendant’s assistance).
 

 Nevertheless, we do not find that the circuit court erred in summarily denying this claim. In denying Hunter’s claim, the circuit court concluded that Hunter’s allegations were facially insufficient to establish that Hunter would probably be acquitted of the murder of Wayne Simpson and noted that Hunter’s motion did not allege that Boyd claimed to have murdered Simpson.
 

 Hunter’s allegations are indeed insufficient to support his claim of innocence of first-degree murder. Hunter was convicted of multiple charges against multiple victims: the first-degree murder and attempted armed robbery of Simpson, the attempted first-degree murder and armed robbery of Cooley, the attempted first-degree murder and armed robbery of Theodore Troutman, and the attempted first-degree murder and armed robbery of Michael Howard. However, Hunter’s motion only specifically alleged that codefen-dant Boyd confessed to shooting one victim: Cooley. Although Hunter’s motion repeatedly referred to another codefen-dant having confessed to being “the shooter” and stated that the evidence would establish that Hunter was not present during “the shooting” or involved in “the shooting,” the only shooting specifically identified in the motion was the shooting of Cooley. Although Hunter contends on appeal that Boyd’s confession leads to the logical conclusion that Boyd shot the four victims, this was never alleged in the motion. At the
 
 Huff
 
 hearing on the motion, postconviction counsel even conceded that he was not prepared to say that Boyd had confessed to killing Simpson.
 

 Unlike the cases discussed above in which the courts remanded for an eviden-tiary hearing based on the post-trial confession of a codefendant, the confession in this case does not concern the only crime for which the defendant was convicted.
 
 *264
 

 Cf. Brantley,
 
 912 So.2d at 342-43 (noting that the defendant was convicted of the first-degree murder of one victim and that the codefendant’s affidavit alleged that the defendant was not present during the victim’s shooting);
 
 Roundtree,
 
 884 So.2d at 323 (observing that the defendant was convicted of armed robbery and that the code-fendant admitted that the defendant had no role in the robbery);
 
 Kendrick,
 
 708 So.2d at 1012 (noting that the defendant was found guilty of trafficking in cocaine and that the codefendant confessed that the cocaine was not the defendant’s);
 
 Gomez,
 
 363 So.2d at 625-26 (discussing the defendant’s conviction for robbery and the codefendant’s post-trial confession to having committed the robbery without the defendant’s assistance). The confession in this case only addresses one of several crimes and does not address the crime for which Hunter claimed innocence in his motion.
 

 Moreover, apart from the specific allegation regarding Boyd’s confession and the reason for the trip to Daytona Beach, the motion was otherwise vague. Although it alleged that the newly discovered evidence would establish that Hunter was not present or involved, it contained no factual allegations to support this statement. Thus, Hunter’s motion insufficiently alleged the facts supporting this claim, in contravention of rule 3.851(e)(1)(D).
 

 Even if we were to find Hunter’s claim to be facially sufficient, Hunter has not satisfied the second prong of
 
 Jones.
 
 The newly discovered evidence is not of such a nature that it would probably produce an acquittal on retrial.
 
 [5]
 
 As explained below, evidence was presented at trial through the testimony of multiple witnesses on each of the matters alleged in Hunter’s successive motion.
 

 First, each of the surviving victims testified at trial. Michael Howard testified that he was with Wayne Simpson, Theodore Troutman, and Taurus Cooley shortly after midnight on September 17, 1992, at the Munch Shop near Bethune-Cookman College. He testified that they were approached by four black males that he had never seen before and told to “give it up.” Howard identified Hunter in court as the one who told them to “give it up.” Howard testified that Hunter had a chrome gun. Howard said that Hunter ordered Cooley to take off his shirt and that Hunter then shot Cooley in the chest with the chrome gun. Howard testified that he then saw the gun wave toward him and that he turned around and heard three more shots. Howard said he noticed that he had been shot after he started running away and there was blood running down his back.
 

 Troutman testified that he was with Simpson, Howard, and Cooley at the Munch Shop during the late evening hours of September 16, 1992, until just after midnight on September 17, 1992. Trout-man testified that he and his friends were approached by several men and that he heard one of them say to “give it up.” Troutman stated that he saw multiple guns, including a long, black gun that had been put to his neck and a silver handgun. Troutman identified Hunter as one of the men that night. Troutman testified that he saw Hunter with the silver gun. Trout-man testified that he saw Cooley taking off his shirt and that Troutman then heard gunfire. Troutman testified that he himself was later shot.
 

 
 *265
 
 Cooley testified that he was with Simpson, Troutman, and Howard at the Munch Shop on the night of September 16, 1992, when they were approached by four men. Cooley testified that he had never seen any of the four men prior to that night. However, Cooley identified both Hunter and Boyd in court. Cooley testified that three of the men had guns and that Hunter told them to give up their possessions and money and that Boyd told them to lie down. Cooley testified that Boyd put a long gun to Troutman’s neck and that Hunter put a gun on Cooley. Cooley testified that Hunter had a small chrome handgun, “like a .25.” Cooley testified that Hunter pointed the gun at Cooley and told him to take off his shirt. Cooley said that he took off his shirt and had it in his hand when Hunter shot him in the chest. Cooley testified that Hunter shot Simpson, Troutman, and Howard a couple of seconds later.
 

 Second, two of Hunter’s companions on the night in question also testified at trial. Tammie Cowan testified that she was with James Hunter, Charles Anderson, Bruce Pope, Eric Boyd, and Cathy Woodward on September 16, 1992, and traveled with them from St. Augustine to DeLand and then to Daytona in a friend’s car that she was driving. She testified that Hunter told her that he wanted to go to Daytona and gave her directions from DeLand to Daytona. Cowan said that Hunter said he wanted to go by a girl’s house to get marijuana. She testified that after they went to the girl’s house, she drove a couple of blocks and that Hunter told her to stop. Cowan stated that she had seen a few black men and that Hunter told her to stop the car about three blocks from the men they had seen. Cowan testified that the four men in the car got out with the guns. Cowan testified that Hunter had the silver gun and that Boyd had a gun. Cowan testified that the men walked behind the car and across the street. She said that while she and Woodward were sitting in the car, she heard a sound like a backfire of a car. Cowan testified that she heard one shot and then three more from the direction that the men walked in. Cowan stated that the four men came back to the car and that Hunter told her to drive off and that Hunter said one of the men tried to run so he shot at him. Cowan also testified that Hunter had the silver gun when he got back in the car and that Boyd and Anderson had the BB guns with them.
 

 Pope testified that on September 16, 1992, he traveled with Hunter, Cowan, Woodward, Boyd, and Anderson to De-Land from St. Augustine to visit Pope’s mother. He testified that Hunter had a .25 automatic chrome gun with a white pearl handle and that Anderson and Boyd had BB guns. He testified that after leaving DeLand, they went to Daytona. He said that it was Hunter’s idea and that Hunter gave Cowan directions. Pope testified that they stopped at a girl’s house in Daytona to get marijuana and that Hunter got out of the car. Pope stated that after Hunter got back in the car, they drove around with Hunter telling Cowan how to get where they wanted to go. Pope testified that near the Bethune-Cookman College area they saw four guys sitting down and that Hunter told Cowan to stop the car. He testified that he got out of the car with Hunter, Boyd, and Anderson and that Anderson and Boyd had the BB guns and that Hunter had the silver gun. Pope testified that they went to where the men were sitting. Pope testified that Hunter pointed a gun at the chest of one of the men and that the man took off his shirt. Pope said that he was turned around and that then he heard a gunshot and saw a flash from Hunter’s gun. Pope testified that at the time that the man was shot taking off his shirt, Boyd was standing
 
 *266
 
 with his gun over three of the men who were lying on the ground. Pope said that after he saw the flash from Hunter’s gun, Pope ran back to the car and heard three more gunshots. Pope stated that he saw Hunter with the silver gun on his way back to the car.
 

 In sum, every part of Hunter’s newly discovered evidence claim was addressed through the testimony of multiple witnesses at trial. Multiple witnesses testified that it was Hunter’s idea to go to Daytona Beach to obtain marijuana from a girl. Multiple witnesses, both victims and perpetrators, testified that Hunter was armed with a chrome handgun and was present at the scene of the robberies and shootings. Moreover, multiple witnesses testified that Hunter shot Cooley (and the other victims), or they gave testimony implying as much. This is not a situation where the State’s case was based on the testimony of one key witness and there was no other evidence tying the defendant to the crimes.
 
 Cf. Johnson v. Singletary,
 
 647 So.2d 106, 111 (Fla.1994) (remanding for an evidentiary hearing where the State’s case was based almost entirely on one person’s eyewitness testimony and there was no other evidence tying the defendant to the crime and where several affidavits stated that another person confessed to committing the crime). Furthermore, even if Pope is now recanting his trial testimony as Hunter’s motion implied and would testily at a new trial, he could still be impeached at a new trial with his prior inconsistent statements given at Hunter’s original trial.
 
 See
 
 § 90.608(1), Fla. Stat. (2007). In light of the strong testimonial evidence establishing Hunter’s guilt, we conclude that the newly discovered evidence would not probably produce an acquittal on retrial.
 

 Accordingly, we hold that the circuit court did not err in denying an evidentiary hearing on Hunter’s claim of newly discovered evidence that another codefendant was the shooter.
 

 CONFLICT OF INTEREST
 

 Hunter asserts that the circuit court erred in denying an evidentiary hearing on his claim of newly discovered evidence of trial counsel’s actual conflict of interest. Hunter claims that newly discovered evidence establishes that defense counsel George Burden had an actual conflict of interest because he was a member of the same public defender’s office that had represented witness and victim Taui’us Cooley. The circuit court denied this claim, concluding that the claim was untimely and that the evidence could have been discovered prior to the initial post-conviction evidentiary healing through the exercise of due diligence.
 

 In light of Hunter’s failure to sufficiently allege his diligence and timeliness in pursuing this claim in accordance with the requirements of rule 3.851, we find that the circuit court correctly denied this claim. In Hunter’s initial postconviction motion filed in 1999, Hunter raised a claim alleging that trial counsel Burden had an actual conflict of interest during his representation of Hunter because the public defender’s office also represented Cooley when he was a witness against Hunter. The posteonviction trial court held an evi-dentiary hearing on this claim at which Cooley, Hunter, Burden, and trial prosecutor Elizabeth Blackburn-Gardner testified. Through the testimony and evidence introduced at the hearing, Hunter demonstrated that other members of the same public defender’s office had represented Cooley in a number of unrelated criminal charges within the year preceding Hunter’s trial. However, Burden and Blackburn-Gardner testified that they were either unaware of or could not recall that Cooley had a crimi
 
 *267
 
 nal history and was represented by the public defender’s office. The trial court ultimately denied relief, and this court affirmed the denial.
 
 Hunter II,
 
 817 So.2d at 793.
 
 [6]
 
 Thus, the issue of Burden’s alleged conflict of interest was previously raised and decided in Hunter’s first postconviction proceedings.
 

 Claims raised in prior postconviction proceedings cannot be relitigated in a subsequent postconviction motion unless the movant can demonstrate that the grounds for relief were not known and could not have been known at the time of the earlier proceeding.
 
 See Wright v. State,
 
 857 So.2d 861, 868 (Fla.2003). Rule 3.851 requires motions filed beyond the time limitations to specifically allege that the facts on which the claim is predicated were unknown or could not have been ascertained by the exercise of due diligence. Fla. R.Crim. P. 3.851(d)(2)(A). Furthermore, the rule requires successive motions to articulate the reasons why a claim was not raised previously and why the evidence used in support of the claim was not previously available. Fla. R.Crim. P. 3.851(e)(2)(B), (e)(2)(C)(iv). Hunter’s motion does not satisfy any of these requirements.
 

 Hunter presented the following allegations. He alleged that an NCIC/FCIC (National Crime Information Center/Florida Crime Information Center) report detailing Cooley’s criminal background was obtained by Blackburn-Gardner and delivered to Burden before Hunter’s trial. He alleged that this evidence was discovered within one year of the filing of the motion. Hunter further alleged that postconviction counsel was deceived by the testimony of Blackburn-Gardner and Burden at the time of the previous evidentiary hearing as to their alleged lack of knowledge of Cooley’s criminal background and the conflict of interest. When asked at the
 
 Huff
 
 hearing about the timeliness of this claim, Hunter’s current postconviction counsel stated that the previous postconviction counsel who had filed the motion on behalf of Hunter would be available to testify as to the facts and circumstances of the discovery of the NCIC/FCIC report and the diligence he exercised. However, no facts or circumstances were ever alleged in the motion. The motion did not assert that the report could not have been discovered previously, and it did not give a reason why it was not previously available. In sum, apart from cursorily stating that the evidence was discovered within a year of the filing of the motion and that the testimony at the previous evidentiary hearing deceived counsel, Hunter did not make any allegations concerning the timeliness of this claim or the diligence used to pursue it.
 

 In light of Hunter’s deficient allegations regarding the timeliness of the claim and the diligence used to pursue it, we hold that the circuit court correctly denied Hunter’s claim as untimely.
 

 
 *268
 
 WITNESS’S COMPETENCY TO TESTIFY AT TRIAL
 

 Hunter contends that the circuit court erred in denying an evidentiary hearing on his claim of newly discovered evidence of witness Taurus Cooley’s incompetence to testify at Hunter’s trial. Hunter argues that Cooley’s adjudication of not guilty by reason of insanity in proceedings that occurred in 2001, years after Hunter’s trial in 1993, established that Cooley was incompetent to testify at Hunter’s trial. The circuit court denied this claim, concluding that the evidence could not be considered newly discovered evidence and noting that Hunter did not allege that Cooley was also incompetent to testify at the prior postcon-viction proceedings in which Hunter called Cooley as a witness. The circuit court also held that the claim was facially insufficient in numerous respects, observing that Hunter failed to provide the relevant details about proposed expert witnesses as required by rule 3.851, failed to allege that Cooley was consenting to submit to a mental status examination, and failed to allege any facts showing how Cooley’s 2001 post-trial adjudication would have any relevance to his competence to testify at Hunter’s trial in 1993.
 

 On appeal, Hunter contends that the evidence may be properly considered newly discovered evidence, citing this Court’s decisions in
 
 State v. Mills,
 
 788 So.2d 249 (Fla.2001), and
 
 Scott v. Dugger,
 
 604 So.2d 465 (Fla.1992). The State disagrees, citing among other cases this Court’s decisions in
 
 Porter v. State,
 
 653 So.2d 374 (Fla.1995), and
 
 Kearse v. State,
 
 969 So.2d 976 (Fla.2007). Because we conclude that the circuit court correctly determined that Hunter’s claim was facially insufficient in several respects, we need not decide whether the evidence qualifies as newly discovered evidence. As explained below, we conclude that the circuit court’s summary denial of this claim was proper.
 

 Hunter claimed that Cooley was incompetent to testify at Hunter’s trial. Hunter alleged that Cooley was declared legally insane and not guilty by reason of insanity on several felony charges in proceedings that occmred after Hunter’s trial. While Hunter asserted that the adjudication occurred after the original postconviction proceedings, Hunter provided no other facts in support of this claim, including any facts demonstrating Cooley’s incompetence in 1993. Further, he did not identify when or where the adjudication occurred. Although the circuit court’s order denying postconviction relief noted that the adjudication occmred in 2001 in Volu-sia County, Hunter failed to allege these facts in his motion. Thus, Hunter failed to provide detailed allegations of the factual basis for this claim as required by rule 3.851(e)(1)(D). Furthermore, while Hunter asserted in his motion that evidence to support the claim included court documents of Cooley’s proceedings, no documents from Cooley’s proceedings were attached to the motion in the record that this Court has on appeal. Thus, it appears that Hunter failed to attach the documents he relied upon, in contravention of rule 3.851(e)(2)(C)(iii). In support of his claim, Hunter asserted that he “may also produce expert witness testimony as to the nature and extent of Mr. Cooley’s longstanding disorder and its impact on Mr. Cooley’s competence to have testified against Mr. Hunter.” However, as the circuit court acknowledged, Hunter failed to provide the name, address, and telephone number of the expert witness supporting the claim, contrary to the requirements of rule 3.851(e)(2)(C)(i).
 

 In sum, as the circuit court found, Hunter failed to sufficiently allege facts to show how Cooley’s post-trial adjudication of not guilty by reason of insanity in 2001 would
 
 *269
 
 have any relevance to Cooley’s competence to testify at Hunter’s trial in 1993, and also failed to meet several pleading requirements of rule 3.851.
 
 [7]
 

 Even if we were to find that Hunter sufficiently alleged his claim and that the evidence properly qualifies as newly discovered evidence, Hunter has not satisfied the second prong of
 
 Jones.
 
 The evidence alleged by Hunter is not of such a nature that it would probably produce an acquittal on retrial. The record demonstrates that other witnesses testified as to the same matters to which Cooley testified. The other surviving victims, Howard and Troutman, and two of Hunter’s companions, Cowan and Pope, testified that Hunter was aimed with a chrome handgun and was present at the scene of the robberies and shootings. Moreover, Howard testified that Hunter shot Cooley, and Pope gave testimony clearly implying as much. While no other witness apart from Cooley explicitly testified that he or she saw Hunter shoot the other victims, the testimony of Cowan and Pope suggested that Hunter retained possession of the gun after all four victims were shot. In light of the strong testimonial evidence establishing Hunter’s guilt, we conclude that the evidence of Cooley’s alleged incompetence would not probably produce an acquittal on retrial as required by
 
 Jones.
 

 Accordingly, we hold that the trial court did not err in denying an evidentiary hearing on Hunter’s claim of newly discovered evidence that Cooley was incompetent to testify at Hunter’s trial.
 

 BRADY
 
 AND
 
 GIGLIO
 

 Hunter asserts that the circuit court erred in denying an evidentiary hearing on his claim that the State withheld favorable evidence in violation of
 
 Brady
 
 and presented misleading evidence in violation of
 
 Gig-lio.
 
 Specifically, Hunter claims that the State threatened witness Tammie Cowan with a life sentence if she did not testify against Hunter and that this threat was not disclosed to the defense. The circuit court denied this claim, noting that
 
 Giglio
 
 was inapplicable because the motion failed to allege that any aspect of Cowan’s testimony was false and that the proposed testimony would not satisfy the materiality prong of
 
 Brady.
 
 The circuit court also concluded that Hunter’s claim failed to meet the requirements for relief based on a claim of newly discovered evidence because it could have been discovered through due diligence.
 

 In light of Hunter’s specific allegations concerning his diligence, we find that the circuit court improperly found that Hunter’s claim was procedurally barred because the evidence could have been discovered previously through the exercise of due diligence.
 
 [8]
 
 Hunter’s motion satisfies the pleading requirements of rule 3.851 with respect to timeliness and diligence. Hunter alleged that Cowan could not be located during the pendency of the
 
 *270
 
 initial postconviction proceedings, despite due diligence. He specifically asserted that “Ms. Cowan had been incarcerated during that period of time and, prior to her incarceration, had not maintained a consistent residence where she could have been located to obtain a statement.” While the State may contest Hunter’s diligence, Hunter sufficiently alleged the reason why this claim was not presented previously. Moreover, because the circuit court summarily denied Hunter’s claim, this Court must accept Hunter’s allegations as true to the extent that they are not conclusively refuted by the record.
 
 See Rutherford,
 
 926 So.2d at 1108. As nothing in the record conclusively refutes Hunter’s allegations, we must accept Hunter’s allegations regarding his diligence as true. Accordingly, we find that the circuit court erred in denying Hunter’s claim on this ground.
 

 Nevertheless, we do not find that the circuit court erred in summarily denying this claim. Hunter’s allegations for his
 
 Giglio
 
 and
 
 Brady
 
 claim are insufficient and conclusively refuted by the record.
 

 A
 
 Giglio
 
 claim alleges that a prosecutor knowingly presented false testimony against the defendant.
 
 See Giglio,
 
 405 U.S. at 153, 92 S.Ct. 763. “To establish a
 
 Giglio
 
 violation, it must be shown that: (1) the testimony given was false; (2) the prosecutor knew the testimony was false; and (3) the statement was material.”
 
 Guzman v. State,
 
 868 So.2d 498, 505 (Fla.2003) (citing
 
 Ventura v. State,
 
 794 So.2d 553, 562 (Fla.2001)). “Under
 
 Giglio,
 
 where the prosecutor knowingly uses perjured testimony, or fails to correct what the prosecutor later learns is false testimony, the false evidence is material ‘if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.’ ”
 
 Guzman,
 
 868 So.2d at 506 (quoting
 
 United States v. Agurs,
 
 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976)). Under this standard, the State has the burden to prove that false testimony was not material by demonstrating that it was harmless beyond a reasonable doubt.
 
 Id.; see also Mordenti v. State,
 
 894 So.2d 161, 175 (Fla.2004). Thus, the standard applied under the third prong of the
 
 Giglio
 
 test is more defense-friendly than the test set out in
 
 Strickler v. Greene,
 
 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999), which is applied to a violation under
 
 Brady. See Guzman,
 
 868 So.2d at 507.
 

 Brady
 
 requires the State to disclose material information within its possession or control that is favorable to the defense.
 
 Mordenti,
 
 894 So.2d at 168. To establish a
 
 Brady
 
 violation, the defendant has the burden to show (1) that favorable evidence — either exculpatory or impeaching, (2) was willfully or inadvertently suppressed by the State, and (3) because the evidence was material, the defendant was prejudiced.
 
 Strickler,
 
 527 U.S. at 281-82, 119 S.Ct. 1936;
 
 see also Way v. State,
 
 760 So.2d 903, 910 (Fla.2000). To meet the materiality prong, the defendant must demonstrate a reasonable probability that had the suppressed evidence been disclosed the jury would have reached a different verdict.
 
 Strickler,
 
 527 U.S. at 289, 119 S.Ct. 1936. A reasonable probability is a probability sufficient to undermine confidence in the outcome.
 
 Way,
 
 760 So.2d at 913;
 
 see also Strickler,
 
 527 U.S. at 290, 119 S.Ct. 1936. The remedy of retrial for the State’s suppression of evidence favorable to the defense is available when “the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.”
 
 Strickler,
 
 527 U.S. at 290, 119 S.Ct. 1936 (quoting
 
 Kyles v. Whitley,
 
 514 U.S. 419, 435, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)). When determin
 
 *271
 
 ing materiality, the cumulative effect of the suppressed evidence must be considered.
 
 Lightbourne v. State,
 
 841 So.2d 431, 437 (Fla.2003). Furthermore, the impeachment value of the undisclosed evidence must be analyzed in determining whether prejudice ensued.
 
 Mordenti,
 
 894 So.2d at 170.
 

 The circuit court found that
 
 Giglio
 
 was inapplicable because Hunter did not claim that any aspect of Cowan’s trial testimony was false. The circuit court correctly concluded that Hunter’s allegations failed to state a claim under
 
 Giglio.
 
 Although Hunter argues on appeal that “it is clear that the crux of Mr. Hunter’s claim is that Cowan’s damaging testimony was false and was the direct result of the threats and promises made to her by the State,” Hunter’s motion contained no clear allegation that Cowan’s testimony was false. While Hunter vaguely asserted that because the State’s threat to Cowan was not disclosed to the defense, it constituted a violation of the duties established in
 
 Gig-lio
 
 “forbidding the presentation of false or misleading evidence,” Hunter failed to present any specific allegations in support of his
 
 Giglio
 
 claim. Hunter failed to allege that Cowan gave false testimony, he failed to allege that the prosecutor knew that Cowan’s testimony was false, and he failed to allege that Cowan’s testimony was material. In sum, Hunter failed to allege any of the elements of a
 
 Giglio
 
 claim. Given the significant pleading deficiencies of Hunter’s
 
 Giglio
 
 claim, the circuit court’s summary denial of Hunter’s
 
 Giglio
 
 claim was proper.
 
 See Rodriguez v. State,
 
 919 So.2d 1252, 1269-70 (Fla.2005) (affirming the summary denial of a
 
 Giglio
 
 claim that failed to show that the testimony was false or that the prosecutor had knowledge of the allegedly false testimony).
 

 Hunter’s
 
 Brady
 
 claim also is quite conclusory, although it may contain sufficient allegations to establish the first two prongs of
 
 Brady.
 
 Nevertheless, we do not find that the circuit court erred in summarily denying this claim. The circuit court properly found that Hunter’s allegations would not satisfy the materiality prong of
 
 Brady.
 
 There is no reasonable probability that had the evidence been disclosed the jury would have reached a different verdict.
 
 [9]
 

 At trial, Cowan’s credibility was impeached in several respects, including her motive for testifying. Cowan testified that she was charged with accessory after the fact to armed robbery and accessory after the fact to murder for her role in the crimes with which Hunter was charged. Cowan testified that she entered a plea to the charges. She testified that she was serving a sentence of 364 days and five years’ probation as a result of entering pleas to the two charges. She also testified that one of the crimes she pleaded to was a first-degree felony, punishable by up to life imprisonment. Cowan further testified that she had been worried about being charged with the murder. Cowan testified that she received five year’s probation, “if [she] would cooperate.” When asked if that included testifying at trial, Cowan testified both affirmatively and negatively and said that she was confused. Cowan also testified that she was .mad at Hunter for having caused the car Cowan had borrowed to be impounded and for failing to bond her out as he had promised. In sum,
 
 *272
 
 although Cowan was otherwise impeached at trial, evidence that the State had threatened her with a life sentence if she did not testify against Hunter was not presented. However, even though it was not presented, the impeachment value is limited in light of the fact that Cowan was otherwise impeached in several respects.
 

 Furthermore, much of Cowan’s testimony was corroborated through the testimony of Bruce Pope, one of Hunter’s code-fendants. Pope and Cowan gave similar testimony about the sequence of events leading up to the shooting in Daytona. Both Pope and Cowan testified that Hunter had the chrome gun when he exited the car with Pope, Boyd, and Anderson, and both testified that Hunter had the gun after the shootings.
 

 The record also contains extensive evidence of Hunter’s guilt. Pope and the three surviving victims not only testified that Hunter was armed with a chrome handgun and was present at the scene of the robberies and shootings but also testified that Hunter shot the four victims, or they gave testimony implying as much. In light of the extensive evidence of Hunter’s guilt and Cowan’s impeachment at trial, there is no reasonable probability that had the information been disclosed to Hunter the result of the proceeding would have been different.
 

 Accordingly, we conclude that the circuit court did not err in denying an evidentiary hearing on Hunter’s claim that the State withheld favorable evidence in violation of
 
 Brady
 
 and presented misleading evidence in violation of
 
 Giglio.
 

 CONCLUSION
 

 For the foregoing reasons, we affirm the circuit court’s denial of Hunter’s successive rule 3.851 motion for postconviction relief.
 

 It is so ordered.
 

 QUINCE, C.J., WELLS, ANSTEAJD, PARIENTE, LEWIS, and BELL, JJ„ and CANTERO, Senior Justice, concur.
 

 [1]
 

 .
 
 Huff v. State,
 
 622 So.2d 982 (Fla.1993).
 

 [2]
 

 .Hunter and Boyd were tried together. Neither Hunter nor Boyd testified at trial. The jury found Hunter guilty of all counts as charged in the indictment and recommended that he be sentenced to death. The jury found Boyd guilty of all counts as charged in the indictment, except the jury found Boyd guilty of the lesser included offense of attempted second-degree murder of Cooley. The jury recommended a life sentence for Boyd.
 

 [4]
 

 . Anderson awaited trial on the charges at the time of Hunter's trial. He did not testify at Hunter’s trial.
 

 [5]
 

 . In his postconviction motion, Hunter only contended that the newly discovered evidence would likely produce an acquittal on retrial. Thus, to the extent that Hunter argues on appeal that the newly discovered evidence would probably produce a less severe sentence, this argument is not properly before this Court.
 

 [6]
 

 . This Court specifically held that while Hunter articulated a potential conflict of interest, the trial court did not err in concluding that Hunter failed to demonstrate that an actual conflict of interest existed that affected his attorney’s performance under the circumstances in the case.
 
 Hunter II,
 
 817 So.2d at 793. This Court also held that even if an actual conflict of interest existed within the public defender's office, Hunter failed to demonstrate that the conflict adversely affected his attorney’s representation.
 
 Id.
 
 This Court noted that irial counsel's testimony at the evidentiary hearing that he was not aware of Cooley’s criminal background or the public defender's prior representation of Cooley refuted Hunter's contention that the conflict prevented adequate cross-examination of Cooley about his recent and impending criminal charges in an attempt to impeach Cooley's credibility.
 
 Id.
 
 The federal district court and the Eleventh Circuit Court of Appeals likewise denied relief on this claim.
 
 See Hunter III,
 
 395 F.3d at 1200, 1202.
 

 [7]
 

 . Moreover, we question Hunter's diligence and timeliness in presenting a claim challenging Cooley's competency to testify at trial. During Hunter’s prior postconviction proceedings in 2000, the father of victim Wayne Simpson informed the court that when he confronted Cooley about Cooley’s demeanor and actions at the postconviction proceedings, Cooley described himself as a "mental case,” who was "not supposed to be here." Thus, the record demonstrates that as early as 2000, Hunter was informed of a possible issue concerning Cooley's mental competency.
 

 [8]
 

 . Based on the arguments presented by the State in its response to Hunter's motion and at the
 
 Huff
 
 hearing, it appears that the contested diligence aspect concerned Hunter's failure to present this claim in the prior post-conviction proceedings, not his failure to use diligence at the time of trial.
 

 [9]
 

 . Although Hunter argues on appeal that the evidence was material to Hunter’s punishment, Hunter failed to allege the materiality as to punishment in his postconviction motion, and his postconviction motion described the relief sought as exoneration or a new trial. Thus, Hunter's argument regarding the materiality as to punishment is not properly before this Court.